```
 1                UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3  UNITED STATES OF AMERICA,    )  Case 1:06-CR-0002-JWS
                                 )
 4             Plaintiff,        )
                                 )
 5      vs.                      )
                                 )
 6  BILLY WAYNE HANES,           )
                                 )
 7             Defendant.        )
                                 )
 8
 9
10  TRANSCRIPT OF APPLICATION FOR STATE SEARCH WARRANT 1SI-06-11 SW
11      BEFORE A JUDGE OR MAGISTRATE OF THE STATE OF ALASKA
12              BY DETECTIVE ROGER T. STEVENER
                    SITKA POLICE DEPARTMENT
13
14                      Sitka, Alaska
15
            February 21, 2006 - Pages 2 through 11
16
17
18
19
    Transcription Service:  GAYLENE'S WORD SERVICES
20                          M. Gaylene Larrecou
                            7330 Madelynne Dr.
21                          Anchorage, Alaska  99504-4659
                            (907) 338-3936
22
23
24  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
25
```

1         P R O C E E D I N G S

2  1SI-06-11SW

3      THE COURT:  ....-11.  It's Tuesday, the 21st of February

4  at 7:16 p.m.  And, Detective Stevener, sir, if you would raise

5  your right hand.

6      (Oath administered)

7      OFFICER STEVENER:  I do.

8                      ROGER THOMAS STEVENER

9  called as a witness, testified as follows on:

10                         EXAMINATION

11 BY THE COURT:

12 Q    All right.  If you would, to begin, tell us your full name

13      and spell your last name.

14 A    Rogert Thomas Stevener, spelled S-t-e-v-e-n-e-r.

15 Q    And briefly, your employment and any training or

16      experience that would be relevant to this application.

17 A    Yes, sir.  I'm employed as a Sitka Police Officer assigned

18      to the narcotics investigation position under the SEACAD

19      grant.  I've been a police officer since 1992.  Between

20      1992 and 2003, I was a sworn officer in the State of

21      Wyoming, and I've been employed in Sitka since May of 2003

22      and as a drug investigator since September of 2005.  I've

23      attended training in a DEA basic drug investigation course

24      in May of 2005 and also a rural drug interdiction course

25      in the summer of 2002 as well as a couple of

|   |   |                                                                                   |
|---|---|-----------------------------------------------------------------------------------|
| 1 |   | methamphetamine lab recognition courses here in Alaska                            |
| 2 |   | this year.                                                                        |
| 3 | Q | Okay.  Why don't you explain just what it is that brings                          |
| 4 |   | you here this evening?                                                            |
| 5 | A | Yes, sir.  On this evening, an individual, Mr. Jeremy                             |
| 6 |   | Beebe, was arrested on a probation revocation warrant.  In                        |
| 7 |   | this possession at that time was a prescription pill case,                        |
| 8 |   | orange in color, which had a white, powdery substance in                          |
| 9 |   | it.  The substance was tested and presumptively positive                          |
| 10|   | for methamphetamine.  It was tested by myself using a NIC                         |
| 11|   | kit.  The kit identifier is U as in union.  Pursuant to                           |
| 12|   | that and information that has been gathered in an ongoing                         |
| 13|   | investigation, there was some indication that a                                   |
| 14|   | methamphetamine clandestine lab was located at Piscary                            |
| 15|   | (ph) Trailer Court, Number 8.  We had anonymous reports                           |
| 16|   | that the lab was there.                                                           |
| 17|   |     I went and talked to Mr. Marcel Predo (ph), who owns                          |
| 18|   | trailer number 8.  Trailer number 8 is currently under                            |
| 19|   | reconstruction, and Mr. Predo does not live there, but he                         |
| 20|   | does own the property.  I explained to Mr. Predo what the                         |
| 21|   | information we had indicated, and he granted me permission                        |
| 22|   | to enter and search the trailer, looking for evidence of a                        |
| 23|   | methamphetamine lab.                                                              |
| 24|   |     Myself and David Johnson of the Sitka Police                                  |
| 25|   | Department went to the Piscary Trailer Court, Number 8,                           |

1   entered the trailer, and discovered that one of the rooms
2   had been sealed off, and there was a bed in there, a video
3   game set up.  Someone had been living there.  I had
4   confirmed, prior to going there, with Mr. Predo that no
5   one was supposed to be living there.  They were only
6   supposed to be remodeling it.
7       On a woodgrained bookshelf in the corner of this
8   makeshift bedroom was a plastic baggie containing what
9   appeared to be, by my visual estimate, a gram and a half
10  to two grams of a white substance, a white crystal-like
11  substance, which is consistent in both my training and
12  experience with the appearance of methamphetamine.  Some
13  coffee filters, which are commonly used in the
14  manufacturing process, as well as other vessels--Pyrex
15  dishes and whatnot--were observed in the trailer that are
16  commonly used in production methods for methamphetamine.
17  Upon finding the crystal methamphetamine or suspected
18  crystal methamphetamine, Sergeant Johnson and I retreated
19  from the trailer and are applying for this warrant.
20 Q Okay.  It -- since -- I mean, are you here out of an
21  abundance of caution, or is there some other factor which
22  makes you concerned about operating on the basis of
23  Marcel Predo's consent?
24 A There is a concern out of caution.  If we -- if we start
25  to find items that are -- more solidly indicate a meth lab

1  either is there or was there, we'll have to pull back and
2  get a specially trained team to come handle that. Right
3  now I already discussed it with the SEACAD supervisor in
4  Juneau, and he agrees that there's not enough to bring a
5  team yet.
6       The problem with Mr. Predo -- or not the problem but
7  the concern is that Mr. Predo doesn't know who's living
8  there. The person who's living there may or may not have
9  some sort of belief that they have the ability to live
10 there. There have been various people going in and out.
11 There is a wallet in that bedroom. It's a bifold leather-
12 style wallet that may indicate who's living there. We
13 didn't look at that. That wasn't -- the wallet wouldn't
14 be commonly associated with methamphetamine labs, so we
15 didn't look at that at that point. That is one of the
16 things we're asking for, is to look for paperwork or
17 identifying documents.
18 Q  Okay. Did it appear to you that, I mean, this was
19    currently being used and the person was just away or that
20    there was --
21 A  It appears it's currently being lived in and the person's
22    away. The bed's made but not -- not really neatly made.
23    It looks like it's been slept in. There's -- like I said,
24    there's a video game set up, there are some food items
25    there.

```
 1  Q    And have you -- is the electricity on, utilities are
 2       all --
 3  A    The only light we could find on was in that room.  There
 4       is electricity to the trailer, but it's only to that room.
 5  Q    Okay.  And is there any question whatsoever, as far as
 6       you're concerned, that Mr. Predo is in fact the owner of
 7       that?
 8  A    No, sir.
 9  Q    Are the utilities in his name, or do you know?
10  A    I do not know.
11  Q    Okay.  And he disavowed any knowledge that any person
12       would be living in there?
13  A    That's correct.  He said he knew that they -- that they
14       were in there, they were supposed to be doing plumbing, I
15       believe, is what he said.
16  Q    Who was supposed to be doing the plumbing?
17  A    He said he didn't know the guy's name.  Jeremy Beebe was
18       originally in charge of it but said he had another
19       fellow working on plumbing, and Mr. Predo did not know his
20       name.
21  Q    So these are amateurs of some skill level.  These aren't
22       union plumbers or --
23  A    No.  No, amateurs of some skill level.
24  Q    All right.  So you're looking to get in there and do a
25       more thorough search throughout the trailer for controlled
```

```
 1        substances.
 2   A    Correct.  There's boxes and containers that are -- they're
 3        not sealed but they're closed in there that we did not go
 4        into.
 5   Q    Okay.
 6   A    Under the consent.
 7   Q    So items associated with the production of
 8        methamphetamine, including but not limited to coffee
 9        filters, Pyrex vessels -- are we talking baking dishes,
10        are we talking beakers?
11   A    Baking dishes.  They -- they typically use, you know,
12        quart-size dishes, they meaning methamphetamine cooks.
13        Very rarely anymore do we actually find actual beakers,
14        but it's certainly possible.  There's a multitude of
15        things they can use.
16   Q    Other items, chemical solvents and containers?
17   A    They typically use solvents like dry-gas heat, camp fuel,
18        ether in the form of starting fluid.  Then again, this
19        isn't -- it isn't like one container of this thing that
20        would be a trigger.  There'd be multiple containers, more
21        than the average person would be -- would be using.
22   Q    And then -- and documents such as that -- anything in the
23        wallet used to identify who the person who set themselves
24        up there is?
25   A    Yes, sir.
```

1  Q    Okay.  Other than Mr. Beebe, what -- what's the connection
2       from Mr. Beebe to the Piscary (ph) Number 8?
3  A    Mr. Beebe lives at Piscary Number 7.  Mr. Beebe works for
4       Mr. Predo at Baranof Motors --
5  Q    Uh-huh (affirmative).
6  A    -- and, according to Mr. Predo, was given the job of
7       restoring the trailer, of remodeling the trailer.
8  Q    All right.
9  A    Mr. Beebe--again this is according to Mr. Predo--had
10      discussed with Mr. Predo that he had -- was having someone
11      else do the plumbing, but Mr. Beebe certainly has access.
12      In fact, the key we got to get in there came from the
13      Beebe residence, number 7.
14 Q    Okay.  What sparked the interest in number 8?  I mean --
15 A    Anonymous reports we had come in that there was a meth lab
16      in operation there.
17 Q    And if you -- when you say anonymous, are they truly
18      anonymous?
19 A    Truly anonymous.  Crimestoppers phone calls.  We've had
20      several since the theft of an anhydrous ammonia tank back
21      in November.  We've had several calls come in.  Some of
22      them have indicated that there is a lab in operation or
23      was a lab in operation there.
24 Q    Okay.  And had there been any work or surveillance or
25      investigation preceding your application that we haven't

```
 1        discussed?
 2   A    Yes, sir.  All of the tips that we received concerning
 3        both the anhydrous tank and the -- and the lab have been
 4        followed up on, but none with any fruits of labor.
 5   Q    Okay.  Nothing actually confirmed that number 8
 6        Piscary (ph) was a lab location?
 7   A    No, sir.
 8   Q    Okay.  So Mr. Beebe actually didn't give you any
 9        information --
10   A    No, sir.
11   Q    He was arrested, he had this, and you looked for people
12        that were associated with him and -- and combined that
13        with the tip on number 8 and decided to talk to Mr. Predo?
14   A    Yes, sir.
15        THE COURT:  Let's go off record for a moment.  It's 7:27.
16        (Off record)
17        THE COURT:  Okay.  We're back on record at 7:30.  And
18   based on Detective Stevener's sworn testimony, I'm going to
19   find that there's probable cause to believe that on the
20   premises of Piscary (ph) Trailer -- Piscary Trailer Court,
21   Trailer Number 8, which is -- is a gray --
22   A    Yes, sir, a gray trailer.
23        THE COURT:  -- trailer with black trim, there would be
24   found evidence of methamphetamine manufacture or production,
25   items associated with that endeavor, and also and including
```

1  coffee filters, Pyrex vessels, chemical solvents and
2  containers, and also documents identifying the person who
3  appears to be squatting within the trailer and without
4  authority to be on premises as to (indiscernible) living there,
5  all of which would be evidence of the particular crimes of
6  misconduct involving a controlled substance, the warrant be
7  served immediately and return made within the next 10 days.  I
8  signed the warrant today at 7:29 p.m.
9       We're going to go off record at 7:31.
10      (Off record)
11                      END OF PROCEEDING

```
 1                          CERTIFICATE
 2  I certify that the foregoing is a correct transcript to the
 3  best of my knowledge and ability from the electronic sound
 4  recording of the proceedings in the above-entitled matter, and
 5  that due to the recording and/or duplication quality, there are
 6  indiscernible areas on the audio tape which are reflected in
 7  the transcript.
 8
 9
10
11       COPY                                    OCTOBER 3, 2006
12  M. Gaylene Larrecou, Transcriber              Date
13  United States Court Approved
14  AAERT Certified #00285
15
16
17
18
19
20
21
22
23
24
25
```