RECEIVED

IN THE UNITED STATES DISTRICT COURT

OCT 1 0 2006

FOR THE DISTRICT OF ALASKA

CLERK, U.S. DISTRICT COURT
JUNEAU, ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Case No. 1:06-cr-0002-JWS | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| BILLY WAYNE HAYNES, ) REPORT AND | |
| ) RECOMMENDATION ON | |
| Defendant. ) MOTION TO SUPPRESS | |
| ) | |

I. INTRODUCTION:

The defendant, Billy Wayne Haynes, is charged with being a felon in possession of a firearm, being an unlawful user of narcotics in possession of a firearm, possession of methamphetamine, and unlawful possession and manufacture of a destructive device (a pipe bomb). He moves to suppress a number of items on the basis of several allegedly unlawful searches.

The suppression motion raises two claims. His first claim is that the Sitka Police unlawfully entered a trailer in Sitka in which alleged methamphetamine and explosives were found. And the second is that a correctional officer at the Sitka jail unlawfully searched Mr. Haynes' wallet, in which she found, read and seized notes allegedly referring to explosives.

An evidentiary hearing was conducted on the defendant's motion on September 15, 2006. After that hearing, the defendant obtained the tape

recording of the state search warrant proceedings and requested in his reply memorandum that the evidentiary hearing should be reopened as a result of information contained in that recording. A supplemental evidentiary hearing was then conducted on October 6, 2006.[1]

I have considered the evidence presented at the two evidentiary hearings as well as the defendant's memorandum (docket 16), the government's opposition (docket 28), the defendant's reply (docket 37), the transcript of the state search warrant proceedings (docket 43 attachment 1), the defendant's motion for supplementary evidentiary hearing and accompanying affidavit (docket 45 and 46) and the government's response to the defendant's motion to reopen the evidentiary hearing (docket 48), and I make the following findings of fact and recommendations.

II. FINDINGS OF FACT:

1. Detective Roger Stevener of the Sitka Police Department is a narcotics investigator assigned to SEACAD, a regional drug enforcement task force in Southeast Alaska.

2. On February 21, 2006 Detective Stevener received an anonymous tip that methamphetamine was being produced in a trailer at the Vitskari Trailer Court in Sitka. The person who provided the tip did not give the trailer number

---

[1]Transcripts of those hearings are not yet available at the time of preparation of this Report & Recommendation.

but she gave a description of the trailer and stated that it was owned by an individual named Marcel Prato.

3  Detective Stevener and another officer, Sgt. Johnston, knew Mr. Prato as the owner of Baranof Motors, and they went to speak to him at his business. Mr. Prato identified the trailer in question as number 8 and confirmed that he owned the trailer.  Mr. Prato told Detective Stevener that he was having the trailer remodeled by Mr. Jeremy Beebe, and that no one was supposed to be staying in the trailer.

4. It was unclear whether Mr. Prato simply did not give anyone permission to stay in the trailer, or whether he affirmatively told Mr. Beebe that no one could stay in the trailer.

5. Mr. Prato testified that he owns the entire trailer park.  He had recently moved the trailer at number 8 onto the space and confirmed that he was having it remodeled by Mr. Beebe.  The trailer had been an office trailer and was not suitable for use as a residence.  It had no kitchen or bathroom.

6. Before moving the trailer onto space number 8, Mr. Prato had been renting that space to Mr. Beebe.  Mr. Beebe had been using the vacant space to park several vehicles.  The space rental ended when the trailer was moved onto the space.

7. Mr. Beebe's mother lived in a trailer next door at space number 7.  Mr. Beebe was living in a shed which was located near or on the dividing line

between spaces 7 and 8.

8.  While Mr. Prato did not affirmatively give Mr. Beebe or any other person permission to reside in the trailer, he may not have specifically told Mr. Beebe that no one could stay in the trailer. Mr. Prato believed he still had the right to enter the trailer.

9.  Detective Stevener asked Mr. Prato for permission to search the trailer and Mr. Prato responded affirmatively.  Detective Stevener told Mr. Prato that he could be there when they searched the trailer but Mr. Prato declined.

10.  According to Detective Stevener's testimony at the evidentiary hearing, he and Sgt. Johnson proceeded immediately to #8 Vitzcari Trailer Court but found the doors locked.  The officers had another officer dispatched to Baranof Motors to ask Mr. Prato for the key to the trailer.  Within a few minutes Lowell Ford, an employee of Baranof Motors, came to the trailer with a key, unlocked the trailer, and stepped back from the door.

11.  This testimony was different from Detective Stevener's testimony before the Sitka Magistrate, at which time he said that the key to trailer number 8 was obtained from the Beebe residence, number 7.

12.  Detective Stevener and Officer Johnson entered the trailer.  Upon entering the trailer, they initially did an officer safety sweep to make sure no one was in the trailer, and then commenced what Detective Stevener described as a "consent search".

13. As the officers went through the trailer, they observed construction materials and work in progress which made it apparent that remodeling activity was under way.

14. Detective Stevener opened a closed door near the rear of the trailer, behind which the officers found an unfinished room containing signs that someone had been staying there. There was a bed, a table, a shelving unit, and food preparation items.

15. Detective Stevener observed in that room, among other things, a plastic bag containing a white crystalline substance consistent with the appearance of methamphetamine. The plastic bag was located on a shelving unit in the corner of the room.

16. After locating the suspected methamphetamine, Detective Stevener and Sergeant Johnson decided to leave the trailer and apply for a search warrant.

17. Detective Stevener appeared before the Sitka Magistrate, Bruce Horton, and provided oral testimony in support of a search warrant application. After hearing the testimony, Magistrate Horton issued a search warrant.

18. With the search warrant, the officers returned to the trailer and conducted a more detailed search. A field test on the suspected methamphetamine was positive

19. During the execution of the search warrant, officers also observed in the room coffee filters, which are typically used in the production of

methamphetamine, and a bottle of capsules of MSM, which is a nutritional supplement typically used as a "cutting" agent for methamphetamine. Empty capsules consistent with the MSM capsules were found in the trash in the room.

20. Detective Stevener also observed items in the room consistent with the use of narcotics, including hypodermic needles similar to those used by diabetics, and a small piece of elastic consistent with what intravenous drug users use as a tourniquet.

21. Detective Stevener also located an item which he determined to be a partially completed pipe bomb. The pipe bomb was not equipped with a fuse.

22. When they executed the search warrant, Detective Stevener looked in a black duffel bag located in the back room of the trailer where the suspected methamphetamine was found. The duffel bag contained a number of personal items, including photographs of various individuals later identified as relatives of Mr. Haynes, and a small Tupperware container wrapped in black electrical tape with the word "Slayer" written on it, which contained what appeared to be black powder (gunpowder). The word "Slayer", which is the name of a musical group, is also written or tattooed on the defendant's arm. Detective Stevener seized the Tupperware container but did not seize the duffel bags or its other contents.

23. After completing the search, Detective Stevener spoke to the Sitka District Attorney who asked him to seize the other contents of the duffel bag as

well. As a result of this conversation, Detective Stevener spoke to Mr. Prato again and asked him for consent to go back into the trailer. Mr. Prato agreed and Detective Stevener returned to the trailer and seized the black duffel bag.

24. Mr. Haynes was subsequently arrested and lodged at the Sitka Jail. Either when he was booked into the jail, or when he was being prepared for transfer from the Sitka Jail to Lemon Creek Correctional Center in Juneau his belongings were inventoried by jail officer Betty Conklin.

25. Mr. Haynes' belongings included a wallet. Following his arrest the wallet was placed in his property locker, to which he would not have access while incarcerated. When Officer Conklin performed the inventory search, she went through the wallet and discovered three folded pieces of paper.

26. Folded pieces of paper can be used as "slips" or "bindles" to hold small amounts of controlled substances. Officer Conklin unfolded the pieces of paper to look for contraband. After unfolding the papers, Officer Conklin inspected them carefully to ensure that they did not contain contraband. In the course of making this inspection, Officer Conklin was able to read the writing on the papers.

27. Copies of the papers from Mr. Haynes' wallet are found at docket 37, exhibit A.[2]

28. These papers consist of lists of items or things to do. One of the

---

[2]These are copies submitted by defense counsel. Counsel for the government agreed at the October 6 hearing that these were accurate copies.

papers is headed "things to do" and another is headed "shit to do". One of the lists contains the words "fuse for bomb", and another contains the words "pick up fuse (explosive)".

29. Officer Conklin testified that the references to a bomb or explosive were immediately apparent to her when she inspected the papers for contraband. She therefore seized the papers and turned them over to Detective Stevener.

30. Officer Conklin testified that the primary purpose of an inventory search is to prevent introduction of contraband into the jail. Inventory searches are conducted both when a prisoner comes into the jail and when a prisoner is transferred out to Lemon Creek Correctional Center. She testified that the search of Mr. Haynes' wallet was conducted according to standard procedures for inventory searches.

31. Officer Conklin testified that it would not have been possible for her to make a detailed inspection of the folds of the papers for controlled substance without reading some of the words on the papers.

III. DISCUSSION:

    A. *The Trailer Search*:

Officers entered the trailer three separate times. The first and third times were conducted pursuant to consent given by Mr. Prato. The defense does not dispute that Mr. Prato gave consent, but challenges his authority to do so.

It is clear that Mr. Prato was the owner of both the trailer and the land on

which it was parked. The defense contends, however, that Mr. Prato impliedly allowed Mr. Beebe to stay in the trailer while he worked on it, and by doing so he no longer had the authority to allow the police to search the trailer.

In general, a landlord does not have authority to consent to a search of rented property.[3] There is no evidence, however, that Jeremy Beebe was renting the trailer from Marcel Prato. Rather, Mr. Beebe had agreed to do some remodeling work on the trailer in exchange for a rather vague understanding that Mr. Beebe might buy or rent the trailer in the future. While Mr. Beebe may not have been expressly forbidden to stay in the trailer (or to allow another to do so), he was not given express permission to do so. There is no evidence suggesting that Mr. Prato gave Mr. Beebe any kind of possessory interest in the trailer, or in any way surrendered his own right to enter and occupy the trailer. On the contrary, Mr. Prato testified that he believed he had a continuing right to enter the trailer.

This case is similar to *United States v. Yarbrough*.[4] In *Yarbrough*, the owner of a "shack" gave another person permission to stay in the shack in exchange for performing chores around the property. The owner retained a key to the trailer and retained a right of access. The court found that the owner retained "common authority" over the premises such that he had actual authority

---

[3]*Chapman v. United States*, 365 U.S. 610, 616-17 (1961).
[4]852 F.2d 1522 (9th Cir. 1988).

to consent to a search.[5]

Even if Prato did not have actual authority under a common authority theory, the search may be upheld if he had apparent authority. Apparent authority is determined based upon a three-part analysis:[6]

> First, did the searching officer believe some untrue fact that was then used to assess the consent-giver's use of and access to or control over the area searched? Second, was it under the circumstances objectively reasonable to believe that the fact was true? Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?

Mr. Prato told Detective Stevener (1) that he owned the trailer, (2) that it was not fit for habitation, (3) that the trailer was being remodelled, and (4) that no one was supposed to be living there. Based on those facts, Detective Stevener had no reason to believe that Mr. Prato did not have full authority to use and occupy the trailer, and therefore full authority to consent to a search.

To the extent that Mr. Beebe allowed Mr. Haynes to stay in the trailer while Mr. Beebe was remodelling it, this did not make either Mr. Beebe or Mr. Haynes a renter. There is no evidence suggesting that Mr. Haynes was anything more than a squatter.

Admittedly the court is unaware of exactly how Mr. Haynes came to be staying in the trailer. He may have been given permission by Mr. Beebe. And

---

[5]See also *United States v. Matlock*, 415 U.S. 164, 171 (1974).

[6]*United States v. Fiorillo*, 186 F.3d 1136, 1144 (9th Cir. 1999).

Mr. Beebe may even have believed that he had authority to give such permission. But regardless of that, there is no reason to believe either that Mr. Prato surrendered his authority over the trailer, or that Detective Stevener had any reason to question Mr. Prato's authority over the trailer. Accordingly, I conclude that Mr. Prato had either actual or apparent authority to consent to the search.

The defendant does not dispute that, If the initial entry was a lawful consent search, then there was probable cause for the subsequent state search warrant. Accordingly, I do not find any reason to conclude that the items seized from the trailer were seized unlawfully. With respect to the search of the trailer, therefore, I recommend that the motion to suppress be denied.

B. *Additional Evidence*:

At the second evidentiary hearing on October 6 defense counsel requested additional time to seek a *writ of habeas corpus ad testificandum* to obtain the testimony of Jeremy Beebe, who is a prisoner in state custody at Lemon Creek Correctional Center. Defense counsel made an offer of proof that Mr. Beebe would testify that he was renting the property on space 8 from Mr. Prato, that he was remodeling the trailer for Mr. Prato, that he enlisted Mr. Haynes' help in remodeling the trailer, and that he gave Mr. Haynes permission to stay in the trailer. I denied this request because it was untimely. In the order setting on that hearing (docket 47), I made it clear that no evidence would be taken following that hearing.

While defense counsel argues that the need to call Mr. Beebe only came to her attention when she heard from his attorney on October 3,[7] the fact (if it is a fact) that Mr. Beebe gave Mr. Haynes permission to stay in the trailer must have been known to Mr. Haynes himself.  The possible need to call Mr. Beebe as a witness to establish this permission could not have come as a surprise at that point.

More importantly, however, nothing in the offer of proof suggests that Mr. Beebe's testimony would establish that he or Mr. Haynes attained a status beyond that of a lodger or squatter in the trailer.  In other words, nothing in that offer of proof would defeat Mr. Prato's continuing common authority over the trailer.  Accordingly, I do not have reason to believe that Mr. Beebe's testimony would alter the conclusions reached in this report and recommendation.

For those reasons, I do not believe it is necessary to schedule a third evidentiary hearing to allow the defendant to call a witness not called by him at either the initial evidentiary hearing or the second evidentiary hearing held at his request.

C.  *The Inventory Search*:

The final issue has to do with the notes seized from the defendant's wallet at the Sitka jail.  The testimony of Officer Conklin establishes that she went through Mr. Haynes' wallet as an inventory search to itemize his belongings and

---

[7]*See* Affidavit of Counsel, docket 46.

to ensure that contraband was not introduced into either the Sitka Jail or the Lemon Creek Correctional Center in Juneau.[8]

Officer Conklin testified that the search was conducted consistent with the official procedures of the State of Alaska Community Jail program. This testimony was undisputed. An inventory search by state officials is lawful if it comports with the official procedures of the relevant state or local police department and if it otherwise complies with state law.[9]

There is no reason to believe Officer Conklin went beyond the applicable procedures. Clearly it was reasonable for the officer to open up folded pieces of paper in the possession of a person being arrested on a drug offense to ensure that they did not contain controlled substances. It is well known that illegal drugs are packaged in folded pieces of paper known as slips or bindles.

It is the defendant's contention that, in doing so, the officer should not have read the words written on the papers. Officer Conklin testified that it would have been impossible for her to examine the papers carefully enough to ensure that there were not drugs located in the folds of the pages without noticing references to a "fuse for bomb" and an "explosive" on them. I agree with Officer Conklin that

---

[8] It is unclear whether this search took place upon the defendant's entry into the Sitka Jail or before his transfer to Juneau. It is unnecessary to resolve this uncertainty, because the search procedure is the same in both cases.

[9] *United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000); *United States v. Wanless*, 882 F.2d 1459, 1464 (9th Cir. 1989); see generally *Illinois v. Lafayette*, 462 U.S. 640 (1983).

it is not reasonable to expect correctional officers to conduct such searches with their eyes averted in order to not read words on the paper.

The defendant argues that this search violates Alaska law as set out in *D'Antorio v. State*.[10] The defendant's reliance on *D'Antorio* is misplaced because the Alaska court in that case was applying federal law and the Ohio constitution to evaluate an inventory search that occurred in Ohio.

But even if one assumes that the Alaska court would reach a similar conclusion under Alaska law, the scope of the search disallowed in *D'Antorio* went far beyond Officer Conklin's examination of these three folded slips of paper. The officers in *D'Antorio* inventoried the defendant's car following his arrest on a parole violation warrant, and inside closed containers in the vehicle they found hundreds of pages of documents:[11]

> These papers included credit bureau reports, business cards, letters, airline tickets, IRS forms and correspondence, college applications, handwritten notes, newspaper wedding announcements and obituaries, sales receipts, and completed credit applications.

Officers read through these hundreds of pages of documents and attempted to use information contained in them against the defendant in his subsequent prosecution on fraud charges. The Alaska Supreme Court found the inspection of these documents went beyond what was necessary

---

[10] 926 P.2d 1158 (Alaska 1996)

[11] 926 P.2d at 1160.

to protect the owner's property, to protect the police against claims and disputes over lost or stolen property, or to protect the police from danger, which are the three purposes of an inventory search.[12] The court quoted Professor LaFave's comment that "a close or complete reading of documents or letters beyond that necessary to determine their general character would be improper."[13] The court also noted the United States Supreme Court's caution in *Florida v. Wells* that "an inventory search must not be a ruse for a general rummaging in order to discovery incriminating evidence."[14]

There is no reason to believe Officer Conklin was engaging in a general rummaging through the defendant's wallet in a search for incriminating evidence. Rather, the evidence suggests that she was engaging in a limited inspection of folded pieces of paper to ensure that they did not contain contraband. Accordingly, I recommend that the defendant's motion to suppress these notes be denied.

IV. RECOMMENDATION:

For the reasons set forth above I recommend that the defendant's motion

---

[12]*Id.* at 1164.

[13]*Id.* at 1163 n. 8, *quoting* 2 Wayne R. LaFave, *Search & Seizure* §5.3(a) at 482 n. 30 (2d. ed. 1987).

[14]495 U.S. 1, 4 (1990).

to suppress be DENIED.

Objections to this Report & Recommendation should be directed to the District Judge.

DATED this 8th day of October, 2006 at Juneau, Alaska.

**REDACTED SIGNATURE**
_____
Philip M. Pallenberg
United States Magistrate Judge

Pursuant to Local Magistrate Rule 6, a party seeking to object to this proposed finding or recommendation shall file written objections with the Clerk of the U.S. District Court no later than 12:00 noon **FRIDAY, OCTOBER 13, 2006**. Response to any objection shall be filed no later than the close of business on **TUESDAY, OCTOBER 17, 2006**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waive the right to contest those findings on appeal. See, McCall v. Andrus, 628 F.2d 1185, 1187-89 (9th Cir. 1980), cert. denied, McCall v. Watt, 450 U.S. 996 (1981). No response to the objections will be allowed. Objections shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. The parties shall otherwise comply with the provisions of Local Magistrate Rule 6.

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment. See, Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).